IN THE UNITED STATES DISTRICT COURT, WESTERN DISTRICT

POLITICAL PRISONER # DL 4686,
(A/K/A Alton D. Brown),
        Plaintiff,

vs.

TOM WOLF; JOHN E. WETZEL;
DANIEL BURNS; ROBERT GILMORE;
DEPUTY DIALESANDRO; MAJOR
LEGGETT; MIKE ZAKEN; A. J. MORRIS;
SGT. TROUT; SGT. TIKEY; CAPT. SCHRADER;
MICHAEL TROYAN; LT. MEDVIC; CAPT.
DURCO; S. SILBAUGH; C.O. KELLER;
C.O. E.T. GUMBERT; TRACY SHAWLEY;
DEAN GEEHING; KAREN PATTERSON;
JAYME E. GARDNER; DORINA VARNER;
CORRECT CARE SOLUTIONS; BYUNGHAK
JIN; IRMA VIHLIDAL; DR. PARK; DR. ALPERT;
DR. MALHI; LT. STICKLES; C.O. MIHALSKY;
K. PETTY; NURSE J. WATSON; NURSE
WHITMEYER; NURSE FELTON; TODD H. FUNK;
NEDA GREGO; MARGARET GORDAN; ELON
MWAURA; JOHN McANANY; C.H. OPPMAN;
KYLE GUTH; S. LIBERATORE, B. JORDAN; DR.
CARL KELDIE; C.O. AMHOFF; PHARMACIST,

No. 16-1081

(JURY TRIAL DEMANDED)

**RECEIVED**

JUL 22 2016

CLERK, U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

## COMPLAINT

### Preliminary Statement

This is a civil rights complaint by a state POLITICAL prisoner, for damages, declaratory relief and injunctive relief, pursuant to 42 U.S.C. § 1983, alleging cruel and unusual punishment, retaliation, and denial of due process and equal protection of the laws.

in violation of the 1st, 8th, and 14th Amendments to the U.S. Constitution. Plaintiff also alleges various related state law tort claims.

## Jurisdiction

1. The Court has jurisdiction over Plaintiff's federal claims pursuant to 42 U.S.C. §§ 1331 & 1343.

2. The Court has jurisdiction over Plaintiff's state law tort claims pursuant to 42 U.S.C. § 1367.

## PARTIES

3. Plaintiff is a state prisoner who at all relevant times was housed at State Correctional Institution (SCI) - Greene; located at 175 Progress Drive, Waynesburg, PA. 15370.

4. Defendant Wolf, at all times relevant to this complaint, was the Governor of the State of Pennsylvania; located at 225 Main Capitol Building, Harrisburg, PA. 17120.

5. Defendants Wetzel, Burns, Gordon, Oppman, and Varner, at all relevant times, were employed with the Pennsylvania Department of Corrections (Pa.D.O.C.) Headquarters, as Secretary, Deputy Secretary, Dietician, Director of Health Care, and Chief Grievance Officer, respectively; located at 1920 Technology Parkway, Mechanicsburg, PA. 17050.

6. Defendants Gilmore, Zaken, Dialesandro, Leggett, Trayan, Schrader, Durco, Morris, Medvic, Silbaugh, Trout, TiKey, Gumbert, Keller, Stickler, Mihalsky, Jordan, Shawley, Geehring, Patterson, Gardner, Vihlidal, Guth, Pitty, Funk, Whitmeyer, Grego, McAnany, Felton, and Nurse Watson, at all times relevant were employed at SCI-Greene, as Superintendent, Deputy Superintendent, Deputy Superintendent, Major, Shift Commander, RHU (Restricted Housing Unit) Commander, Security/Intelligence Captain, RHU Lieutenant, RHU Lieutenant, Security Lieutenant, RHU Sergeant, RHU Sergeant, RHU Correctional Officer (C.O.), RHU C.O., RHU Lieutenant, RHU C.O., RHU C.O., Grievance Coordinator, Mail Room Supervisor, Business Office Manager, Librarian, Correctional Health Care Administrator (CHCA), CHCA, Nurse, Kitchen Supervisor, Nurse, Nurse Supervisor, Nurse Supervisor, Nurse, and Nurse, respectively; located at 169 Progress Drive, Waynesburg, PA. 15370.

7. Defendants Correct Care Solutions (CCS), Keldie, Alpert, Park, Jin, Malhi, Mwaura,

-2-

and Liberatore, at all relevant times, were employed at SCI-Greene via contract to provide Healthcare to the prisoners, and are located at 1283 Murfreesboro Rd., Ste. 500, Nashville, TN., 37217 (Pa. Regional Office: 600 N. 12th Street, Suite 1 Lemoyne, PA. 17043).

8. Defendants are being sued in their personal capacities; save Defendants Wolf, Wetzel, and Oppman, who are being sued in both personal and official capacities.

## OPERATIVE FACTS

9. On January 21, 2016, Defendant Alpert informed Plaintiff that test results indicated that he had prostate cancer, and that they wanted to treat the cancer with a pill, but wanted to conduct a prostate biopsy first.

10. In an effort to make an informed and prudent decision whether or not to submit to the offer of diagnoses and treatment, Plaintiff made the following demands: (i) access to his medical record; (ii) access to his medical books; (iii) access to the law library computer (to conduct medical research); and (iv), protection from the continuous abusive attacks he had been subjected to by retaliating security and medical staff since his 5/11/15 incarceration at SCI-Greene (said attacks are also partially motivated by racial hate).

11. Plaintiff is a 61 year old African-American Political Prisoner, with FOUR active chronic diseases (Hepatitis C, Chronic Obstructive Pulmonary Disease, and Gastroesophageal Reflux Disease), who has been classified by Defendants as a trouble-maker because of his litigious and iconoclastic behavior, and Prisoner Rights activism.

12. Plaintiff's previous housing at SCI-Greene, from July, 1999 to April, 2000, resulted in two criminal trials, three civil trials, and another case pending a trial date (Plaintiff also filed at least five other civil actions and two criminal complaints against SCI-Greene staff that were the result of abuse (etc) he was subjected to during his temporary housing at SCI-Greene while litigating the aforesaid trials).

-3-

13. Since his recent housing at SCI-Greene, Plaintiff has repeatedly exposed the Defendants' racist, sadistic, barbaric, corrupted, and cowardly behavior and practices, via four private criminal complaints, the Inmate Grievance System, State and Federal Courts, Office of Inspector General, and the Department of State Professional Compliance Office (among others), which has resulted in an all-out attack against Plaintiff and his property (inter alia) by Defendants and those acting in concern with them.

14. Prostate Cancer is a very serious and progressive disease that can spread to other parts of the body; caught in its early stage and not having spread beyond the prostate, there is a high success rate of treating the disease.

15. Plaintiff has been exhibiting signs of cancer since his housing at SCI-Greene, including substantial and continuous weight loss, bleeding from penis and rectum, and involuntary ejections of waste and blood from his rectum and penis (he has recently been experiencing penis and anus/rectum pain).

16. Because of being subjected to numerous acts of abuse and mistreatment by prison medical staff during his nineteen years of solitary confinement within the Pennsylvania Department of Corrections (Pa. D.O.C.), Plaintiff <u>naturally</u> has very little, if any, trust in prison medical staff, who has a history of denying medical care and/or adequate and timely care, for retaliatory reasons (inter alia).

17. Defendants has not only intentionally and sadistically interferred with Plaintiff's effort to obtain access to the information that would allow him to make an informed and prudent decision as to whether or not to accept the offered medical care, but has taken numerous steps to aggravate his fears and suspicions of submitting to such care.

18. Plaintiff is extremely suspicious and fearful of allowing invasive procedures, which Defendants are well aware of, and has taken <u>**no efforts**</u> to temper such fears and suspicions despite having a professional and ethical responsibility to do so.

19. Defendants have committed the following actions and/or inactions in an effort to prevent Plaintiff from making an informed and prudent decision with regards to

-4-

cancer treatment, cause the disease to worsen at a more rapid pace, and sabotage the medical care that he actually was receiving or trying to obtain:

(i) Fail to intervene and have Plaintiff's medical abuse claims investigated by impartial investigators (Wolf and Wetzel);

(ii) Refused to ensure that Plaintiff was allowed access to his property and law library facilities in accordance with prison rules and regulations (Wolf, Wetzel, Burns, Gilmore, Leggett, Zaken, Morris, Trout, Schrader, Troyan, Medvic, Shawley, Varner, Stickles, and Jordan);

(iii) falsifying and/or supporting such falsifications, of medical and other official records to reflect Plaintiff's refusal of medical care for prostate, while intentionally refusing to document and acknowledge his preconditions to accepting and/or rejecting the offered care (Gilmore, Dialesandro, Shawley, Varner, CCS, Jin, Park, Vihlidal, Alpert, Grego, Mwaura, McAnany, Oppman, Guth, Liberatore, and Keldie);

(iv) sabotaging medical appointments, tests, and examinations (Morris, Tikey, Keller, Shawley, Varner, CCS, Jin, Park, Alpert, Malhi, Grego, McAnany, Mwaura, Guth, Liberatore, Amhoff, and Medvic);

(v) sabotaging his nutritional supplements and medications (Gilmore, Dialesandro, Morris, Trout, Leggett, Zaken, Burns, Schrader, Troyan, Medvic, Gumbert, Shawley, Varner, CCS, Jin, Park, Alpert, Malhi, Stickles, Petty, Watson, Whitmeyer, Felton, Pharmacist, Funk, Grego, Gordan, Mwaura, McAnany, Oppman, Guth, Liberatore, and Keldie);

(vi) committing acts/inactions designed to produce stress/anxiety in efforts to weaken his immune system and speed the adverse effects on his body caused by his diseases (Wetzel, Burns, Gilmore, Dialesandro, Leggett, Zaken, Morris, Trout, Tikey, Schrader, Troyan, Medvic, Durco, Silbaugh, Keller, Gumbert, Shawley, Jin, Geehing, Patterson, Gardner, Varner, CCS, Vihlidal, Park, Alpert, Malhi, Stickles, Mihalsky, Petty, Watson, Funk, Whitmeyer, Felton, Grego,

-5-

Gordan, Mwaura, McAnany, Oppman, Guth, Liberatore, Keldie, Amhoff, Jordan and Pharmacist), including: falsifying official reports; denying and contaminating food; physical attacks; psychological abuse; chemical attacks; confiscation and destruction of property; bogus misconduct reports and convictions; confiscation and destruction of outgoing and incoming mail; denial of medical care; denial of access to library materials; denial of personal hygiene items; denial of access to legal property; denial of access to legal aid; harassing cell searches; demeaning/harassing body cavity searches; sabotaging efforts to obtain relief via grievance system; arbitrary cutting of medications and devices; medical abuse/torture; sabotaging his attempts to prosecute active and planned civil and criminal legal matters; unnecessary delays of medical care; baiting; threats; housing around the psychotic prisoners; using prisoners to attack him; housing in strip/special cells unjustifiably; and, refusing to conduct complete and thorough investigations of his abuse allegations (including refusal to collect and preserve evidence in his favor), inter alia;

(vii) refusal to grant him access to his medical records in accordance with state law and prison rules and regulations (Gilmore, Wetzel, Burns, Dialesandro, Shawley, Varner, CCS, Tim, Park, Alpert, Malhi, Grego, McAnany, Oppman, Guth, Mwaura Liberatore, and Keldie); and,

(viii) sabotaging of his efforts to obtain relief via the Inmate Grievance System, the Inmate Abuse Process governed by DC-ADM 001, and the Criminal Complaint/Investigation policy (DC-ADM 004)(Wolf, Wetzel, Burns, Gilmore, Dialesandro, Leggett, Morris, Zaken, Schrader, Durco, Silbaugh, Shawley, Varner, and Stickles).

20. Plaintiff is in imminent and ongoing danger of serious physical injury as a result of the cancer spreading beyond the prostate or getting to a point were it cannot be successfully treated.

21. Plaintiff is also in imminent and ongoing danger of the adverse effects of Defendants attacks and prostate cancer having adverse effects on his other chronic diseases. (<u>Exhibit-A</u>)

22. Defendants acts/inactions has also resulted in continuous pain, mental anguish, stress and anxiety, declining poor quality of life, emotional and psychological damage, and may result in further irreparable injury or death.

23. Plaintiff has a right to such information as is reasonably necessary to make an informed and prudent decision to accept or reject proposed treatment, as well as a reasonable explination of the viable alternative treatments that can be made available, in accordance with state law and health codes, and prison rules and regulations.

24. Plaintiff also has a state law right of access to his medical records, which defendants has denied and delayed access to prevent him from discovering crucial facts regarding the claimed disease, substantiating their claims regarding the disease, and prevent him from discovering false information which they placed therein (inter alia).

25. The delay and denial of access to Plaintiff's medical records are also designed by defendants to aggravate his suspicions and fear of submitting to their care, and give them an oppotunity to doctor his records.

26. The aforesaid acts/inactions by Defendants are also motivated by the desire to save the high cost of Plaintiff's cancer treatment by discouraging him from submitting to their care.

27. The failure of Defendants to provide professional and competent medical and related care for Plaintiff's serious medical needs has produced physical torture, pain and suffering, and the threat of untimely death.

28. Defendants at all times has demonstrated deliberate indifference to Plaintiff's urgent medical and psychological needs.

29. Defendants Wolf, CCS, Wetzel, Oppman, and Keldie, fail to provide adequate supervision and control of their medical and physician staff, agents and ostensible employees, and/or their agents and employees, fail to have proper quality control procedures in tact to conduct review of the medical care rendered Plaintiff during relevant times, did directly and proximately cause and comparatively contribute to the resulting

-7-

harm caused Plaintiff.

30. Defendants Oppman, Dialesandro, Gilmore, CCS, Jin, Vihlidal, Park, Alpert, Malhi, Petty, Watson, Whitmeyer, Felton, Grego, Gordon, Mwaura, McAnany, Guth, Liberatore, Pharmacist, and Keldie, owed Plaintiff a non-delegable duty directly to Plaintiff; such duty to uphold the standard of quality care to ensure his safety and well-being was breached by the failure to personally comply with said standard and/or to oversee all persons who practiced medicine under its employment, including the care provided to Plaintiff.

31. Defendants Oppman, Dialesandro, Gilmore, CCS, Jin, Vihidal, Park, Alpert, Malhi, Guth and Keldie, has a non-delegable duty to:
   (a) use reasonable care in the maintenance of safe and adequate facilities and equipment;
   (b) select and train only competent physicians and support staff;
   (c) oversee all persons who practice medicine within its walls as to patient care; and
   (e) to formulate, adopt and enforce adequate rules and practices to ensure care for all patients.

32. Defendants Gilmore, Zakin, Dialesandro, CCS, Morris, Trout, Schrader, Troyan, Shawley, Jordan, Jin, Vihlidal, Park, Alpert, Malhi, Stickler, Petty, Watson, Whitmeyer, Felton, Funk, Grego, Gordan, Mwaura, McAnany, Guth, Oppman, Liberatore, Grego, and Keldie, made an unwarranted departure from the generally standards of medical practice by failing to provide Plaintiff with timely and adequate information that he needed to make and informed and prudent decision whether to accept or reject the offer and medical care for his CANCER; and, by failing to prevent and/or assisting in, the attacks on Plaintiff mentioned in this complaint (they also deviated from general standards, laws and healthcodes, by failing to take any meaningful steps to temper Plaintiff's fears and suspicions regarding the offered care).

33. The Medical Care Availability and Reduction of Error (MCARE) Act of March 20, 2002, requires that all Commonwealth citizens have access to comprehensive and high-quality healthcare.

34. Defendant CCS and its employees have a contractual duty and obligation to permit prisoners to have access to health care professionals, prescribed treatment for serious medical needs, appropriate nutrition, exercise and personal hygiene items.

35. Defendant CCS and its employees contractual duties requires them to follow DOC policy and procedures set out in policies 13.1.1 and 13.2.1.

36. The purpose of policy 13.1.1 "establishes comprehensive health care management procedures by which the DOC and Contracted Health Care Provider staff can provide professional healthcare services that comply with Department policies and procedures, ACA standards, and applicable laws," which "procedures are integral to planning, managing, evaluating and directing the health care delivery system within the facilities of the Department."

37. The purpose of Pa. D.O.C. "establishes procedures by which the Pa. D.O.C. and Medical vender staff can ensure that all inmates have access to health care and provide professional healthcare services that comply with Pa. D.O.C. policies and procedures, ACA standards, and applicable laws."

38. Any intentional or negligent breach of the duties and responsibilities as described in Pa. D.O.C. policies 13.1.1 and 13.2.1., and ACA standards and applicable laws, constitute a deviation from Defendants' employment obligations and the standard of care owed to Pa. D.O.C. prisoners under their care.

39. Any intentional deviation by Defendants' from the terms of their employment/contract with the Pa. D.O.C. constitutes acts outside of the scope of their employment.

40. Pa. D.O.C. requires it's employees and medical contractors to provide prisoners medical services that at a minimum, must meet good and acceptable medical standards; and must also be consistent with any Pa. D.O.C. policies and protocols, and any relevant national standards that Pa. D.O.C. indicates, such as the American Correctional Association (ACA) standards and National Commission on Correctional Health Care (NCCHC) standards.

41. Pa. D.O.C. also requires that if any applicable DOC policy or protocol for a particular

-9-

type of treatment provides for a lesser degree of care than good and acceptable medical standards, than such good and acceptable medical standards shall take precedence.

42. Pa. D.O.C. also provides if any applicable Pa. D.O.C. policy or protocal establishes a higher standard of care than good and acceptable medical standards, than such DOC policy or protocal shall take precedence.

43. Pa. D.O.C. requires its employees and contractors to provide those basic primary care and ancillary services typically provided to members of the general public by primary care providers.

44. Pa. D.O.C. requires its employees and contractors to provide prisoners with health care and medical services which are equivalent to those available to the general public.

45. Pa. D.O.C. requires its employees and contractors to comply with the State Boards of Medicine, Medical Licensing Rules and Regulations (including, but not limited to, the Medical Practice Act of 1985, 63 §§ 422.1 et. seq., the Osteopathic Medical Practice Act, 63 P.S. §§ 271.1 et. seq., the Professional Nursing Law, 63 P.S. §§ 211 et seq., the Practical Nurse Law, 63 P.S. §§ 651 et seq., and all implementing regulations in the Pennsylvania Code).

46. Defendants deviated from the aforesaid health care policy requirements and/or fail to enforce them, in order that they could have the opportunity to punish and retaliate against the Plaintiff because of his offensive behavior and related activities (including the money, time, inconvenience, and publicity he caused as a result of his previous legal activities against the prison staff), and to save money.

47. The Contract Defendants, in their never-ending efforts to maximize profits, regularly find it necessary to ignore Pa. D.O.C. policy and procedure and the good and acceptable medical standards.

48. Specifically, Defendants ignored the following duties and responsibilities contained in Pa. D.O.C. policy 13.1.1 and its "procedure manual" for the reasons mentioned at paragraph No. 46:

   (i) Provide prisoners with access to health educational manuals;
   (ii) health teaching be provided during individualized inmate encounters and that

-10-

evidence of such teaching is documented within the health record;
(iii) comply with the "informed consent" procedures and standards listed therein;
(iv) comply with the standards and procedures for inmate "refusals" of treatment listed therein.

49. Defendant are bound to the medical duties, responsibilities, and standards listed in Pa. D.O.C. Policy 13.2.1 as a result of their contractual and general employment obligation with the Pa. D.O.C., which requirements were designed to ensure that prisoners <u>receive quality health care</u>:

50. Defendant CCS provides healthcare in prisons under the HMO model, with emphasis on cutting cost.

51. Like most contractors that provide prison related services, Defendant CCS tends to cut cost in terms of staffing and operational expenses, this includes paying lower wages, providing fewer or inferior benefits and hiring less qualified workers who can be payed less (which is manifested by the fact that most of CCS physician employees are foreign trained by third-world countries).

52. CCS were hired, basically, to cut Pa. D.O.C. medical expences.

53. In order to cut cost and turn a profit, CCS specializes in providing substandard care to the prisoners, which also plays a major role in their ability to underbid their competitors (Corizon Health and Wexford Health Sources), for Pa. D.O.C. contracts.

54. In order to cut cost and turn a profit, CCS generally cannot provide healthcare in the manner and quality that are generally practice in this and similar medical communities and prescribed in their contract with Pa. D.O.C.

55. CCS cost cutting schemes include, but are not limited to, the following: partial diagnostic testing; perfunctory sick-call examinations; intentional misdiagnoses; unnecessary delays; doggedly persisting in a course of treatment known to be ineffective; prescribing treatments without considering individuals conditions; avoiding

-11-

specialty medical care consultations; revoking treating physicians medical order; not following orders by physicians; falsifying test results and medical records; making false "refusal" claims regarding treatment offered; ignoring obvious conditions; failing to follow complete diagnostic and treatment procedures and protoco failing to investigate enough to make an informed judgment; making medical decisio based on non-medical factors; providing easier and less efficacious treatment and refusal to comply with State, Federal, and Local Health Codes.

56. As a rule, the higher the PSA level in the blood, the more likely the cancer is near, or has reached the spreading point.

57. Plaintiff "Prostate Specific Antigen" (PSA) test score in Nov. 2006 was normal, at 3.690, with the reference range being < 4.0 ng/mL; by August 2011, the PSA score had advanced to 11.66 (Exhibit-B); by January, 2012, the PSA score had risen to 15.43 (Exhibit-B1); and, as is claimed by Defendant Vihlidal (Exhibit A), as of April, 2016, the PSA score has ballooned to a score of 57.65, which clearly indicates that Plaintiff requires immediate treatment and is in serious/ongoing danger.

58. It is a well-established practice with the Pa. D.O.C. to punish prisoners with litigious behaviors for the purpose of breaking such behavior, hindering/sabotaging their legal activities, and discouraging others from adopting same behaviors.

59. Denying, delaying, and intentionally providing inadequate and/or harmful medical care, are well-established methods employed by the Defendants to punish prisoners with litigious behaviors.

60. Plaintiff is a senior with several serious chronic diseases, who has also been confined in solitary confinement for 19 continuous years under a so-called "disciplinary status"; studies by the National Council on Aging, show that abuse of seniors has a direct impact on the victim's quality of life and mortality, hastens the senior's physical and mental decline and significantly shortens their lifespan; the studies also show that the risk of death for elders who have been mistreated is 300 times higher than

for those who have not been.

61. The attacks mentioned herein are continuous and _naturally_ causes Plaintiff to be in a constant state of fear, stress/distress, anxiety, depression, and/or insecurity.

62. The mind and body interact in _powerful_ ways that affect a person's health; the digestive system is profoundly controlled by the mind (brain); anxiety, depression, and fear dramatically affects the function of this system.

63. Stress can cause physical symptoms even though no physical disease may be present, because the body responds physiologically to emotional stress.

64. Not only can psychologic factors contribute to the onset or aggravation of a wide variety of physical disorders, but also physical disease can effect a person's thinking or mood.

65. Plaintiff's life-threatening and chronic diseases, coupled with Defendants' abuse/torture, frequently causes him to become depressed; which depression has the ability to worsen disease, cause new diseases, and add to his misery and poor quality of life.

66. Stress production is an ideal weapon for the Defendants because it can easily be produced, and is difficult to connect to the abusers' acts, nor the resulting damage caused.

67. Defendants are clearly employing "pressure-tactics" to carry out their retaliation designs, which are substantial threats to cause Plaintiff additional serious injury.

68. Hostility (which is manufactured and aggravated on a daily basis by Defendants' cowardly, barbaric, sadistic, and unlawful acts), is associated with increased levels of circulating catecholamines and increased lipid concentrations — risk factors for coronary heart disease; states of fear, excitement, and acute anger reduce blood flow through atherosclerotic coronary segments and provoke coronary spasm, thus causing abnormal left ventricular wall motion and electrocardiographic evidence of myocardial ischemia; Defendants are well-aware of the many adverse effects of the attacks on this Plaintiff.

69. Stress and related conditions are also a cause of or contribute to the cause of nu-

merous psychological disorders and diseases, which clearly pose a substantial threat to Plaintiff's mental and emotional health, especially when considering the totality of the circumstances and conditions; and the fact that he has exhibited signs and symptoms of suffering from the adverse psychological effects of long-term isolation confinement (including: hostility; depression; dissatisfaction with life; irritability; increased inability to tolerate ordinary stimuli like noise; aggressive fantasies of revenge against abusive staff; out of touch with reality; and, controlling impulses, inter alia), which Defendants' has, and continue to, use as a means to manipulate his emotions and punishment (e.g., they will routinely arouse his emotions then subject him to misconduct reports, arbitrary restrictions (yard, shower, etc.), and add to his disciplinary confinement sentence, when he angerally responds)

70. Defendants' have a well-established history of murdering prisoners via medical neglect, physical and psychological abuse/torture, and intense pressure, and, Plaintiff is in imminent/ongoing danger of being another such victim.

## CLAIMS FOR RELIEF

### COUNT-I (Retaliation)

75. As aforesaid, Defendants deprived Plaintiff of his rights, privileges and immunities under the petition clause of the First Amendment; specifically the right to petition the government for redress of his injuries without being subjected to harassment, abuse, and attacks in retaliation.

### COUNT-II (Excessive Force/Corporal Punishment)

76. As aforesaid, Defendants deprived Plaintiff of his Rights under the Eighth Amendment; specifically, the right to be free of unnecessary uses of force and physical punishments, employed by the Defendants to carry out their retaliatory designs.

### COUNT-III (Denial of Medical Care)

77. As aforesaid, Defendants deprived Plaintiff of his Rights under the Eighth Amendment; specifically, the right to adequate and timely medical care for the conditions caused by his prostate cancer, including pain and weight loss.

### COUNT-IV (Interference with medical care)

78. As aforesaid, Defendants deprived Plaintiff of his Rights under the Eighth Amendment; specifically, the right to adequate and timely medical care for serious physical illnesses, with interference or delay.

### COUNT-V (Denial of Informed Consent)

79. As aforesaid, Defendants denied Plaintiff his Rights under the 14th Amendment; specifically, the Right to be provided sufficient information to allow him to make an informed and prudent decision whether or not to accept the offer of medical for his prostate cancer.

### COUNT-VI (Civil Conspiracy)

80. As aforesaid, Defendants deprived Plaintiff his Rights under the 14th Amendment; specifically, the right to be free of conspiratorial conduct under state and federal law designed to punish him in retaliation for the exercise of his Constitutional Rights.

### COUNT-VII (Denial of Access to the Courts)

81. As aforesaid, Defendants deprived Plaintiff of his Rights under the 14th Amendment; specifically, the right of unhindered access to the Courts.

### COUNT-VIII (Psychological Torture/Abuse)

82. As aforesaid, Defendants deprived Plaintiff his Rights under the Eighth Amendment; specifically, the Right to be free of psychological torture/abuse, including stress production tactics.

### COUNT-IX (Medical Torture/Abuse)

83. As aforesaid, Defendants deprived Plaintiff of his Rights under the 8th Amendment; specifically, the Right to be free of tactics design to make him suspicious of accepting medical care for serious physical illness.

### COUNT-X (Per Se Negligence/Malpractice)

84. As aforesaid, Defendants committed the state law tort of Per se negligence/malpractice when they violated numerous state laws and prison Rules and Regulations regarding Plaintiff's RIGHT to information that would allow him to make an informed and prudent decision to accept or deny medical care for cancer.

### COUNT-XI (Intentional Malpractice)

85. As aforesaid, Defendants committed the State law tort of intentional malpractice when they fail to make any efforts to temper Plaintiff fears, mistrust and suspicions regarding the proposed diagnostic procedure and related medical care for cancer.

### COUNT-XII (Corporate Negligence)

6. As aforesaid, Defendants committed the Tort of Corporate negligence when they fail to select and retain only competent physicians; oversee patient care of all who practice

-16-

medicine within their walls, or formulate, adopt and enforce adequate rules and policies to ensure quality care of patients.

## COUNT-XIII (Intentional Infliction of Emotional Distress)

87. As aforesaid, Defendants committed the state tort of Intentional Infliction of Emotional Distress when they intentionally subjected Plaintiff to stress production attacks and/or fail to prevent such attacks.

## COUNT-XIV (Malpractice)

88. As aforesaid, Defendants committed the state tort of medical malpractice by their failure to provide Plaintiff with sufficient information that would allow him to make an informed and prudent decision whether or not to accept medical care for cancer.

## COUNT-XV (Increased Risk of Harm)

89. As aforesaid, Defendants committed the state tort of Increased Risk of Harm as a result of negligent and intentional acts surrounding the diagnoses and treatment of the prostrate cancer and its adverse effects generally, including the aggravations of his preexisting diseases.

## COUNT-XVI (Equitable Estoppel)

90. Solely as a result of the medical Defendants' contractual and/or employment obligations and agreements with the Commonwealth of Pennsylvania regarding the manner and quality of healthcare to be provided for prisoners, and guidelines and procedures they agreed to follow, which Plaintiff has relied on in his numerous attempts to secure healthcare for his prostate related illnesses, they are precluded from relying on any right they may have had in defense of the claims raised in the complaint with regards to breaches of their professional duties and responsibilities that are specifically covered in the contract or employment duties and responsibilities.

<u>Requested Relief</u>

WHEREFORE, Plaintiff request that the Court grant the following relief:

A. Issue a declaratory judgment that Defendants' acts and/or inactions violated Plaintiff's Constitutional and State Law Rights.

B. Issue a permanent and preliminary injunction requiring Defendants to:
  (1). Provide Plaintiff with access to the information needed for him to make an informed and prudent decision with regards to the offered care for cancer;
  (2). Provide immediate protection from any further retaliatory tactics designed to produce stress and worsen his conditions;
  (3). Provide a unbias healthcare provider not associated with the Defendants, to provide immediate care for Plaintiff's serious health needs described in the complaint

C. Appointment of an independent investigator for investigation of the illegal practices mentioned in the complaint.

D. Federal Protection.

E. Compensatory damages in the amount of $10,000,000 against the Defendants, jointly and severally.

F. Punitive damages in the amount of $10,000,000 against the Defendants, jointly and severally.

G. Cost of this action; and any other relief deemed just and appropriate by this court.

Date: July 19, 2016

/s/ A. Brown
ALTON D. BROWN - DL4686
175 Progress Dr., Waynesburg, PA 15370

<u>VERIFICATION</u>

I hereby verify that the foregoing statements are true and correct to the best of my understanding, knowledge and beliefs. I understand that false statements contained herein will subject me to the penalties of perjury pursuant to 28 U.S.C. §1746.

Date: July 19, 2016

/s/ A. Brown
ALTON D. BROWN

- 18 -